IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.  **Criminal No. 04-193**
Electronically filed

CHARLES SPEAKS, JR.

**MEMORANDUM OPINION**

June 30, 2005

### I.     Introduction

Defendant Charles Speaks has filed a pretrial Motion to Suppress (Document No. 18), seeking to suppress physical evidence, including a .40 caliber Sturm Ruger handgun and 200 packets of heroin, found behind the dashboard of the vehicle he was driving during a warrantless traffic encounter by City of Pittsburgh Police narcotics detectives on the evening of July 31, 2004.  The Court conducted an evidentiary hearing on April 11, 2005, and the parties were directed to submit proposed findings of fact and conclusions of law.

After careful consideration of the respective proposed findings and conclusions, accompanying memoranda of law, and the testimony and evidence adduced at the evidentiary hearing, this Court finds that the police detectives lacked the requisite probable cause to dismantle the dashboard of Defendant's rental vehicle and that the search was thus unlawful under the Fourth Amendment.  Accordingly, the Court is constrained to grant Defendant's Motion to Suppress and prohibit introduction at trial of the heroin, gun, and all other derivative evidence obtained as the fruits of the unlawful search.

### II.    Findings of Fact

#### A.    Substantive Findings

1. Shortly before 10:00 p.m. on July 31, 2004, Pittsburgh narcotics detectives

Edward Fallert and Mark Goob and Sergeant Jason Snyder made a lawful traffic stop of a silver Chrysler Sebring being driven by Defendant, Charles Speaks. Shawn Taylor, a.k.a., Robert Crinshaw, sitting in the front passenger seat, was the only other person in that vehicle.

2.      Pursuant to Fed. R. Evid. 201, the Court takes judicial notice that at 10:00 p.m. on July 31, 2004, the outside temperature was eighty-two degrees, with a relative humidity index of sixty-four percent.[1]

Testimony of Detective Edward Fallert

3.      Detective Fallert testified that he, Goob, and Snyder observed the driver, later identified as Charles Speaks, of a silver Chrysler Sebring commit at least two traffic violations before pulling over to the right side of Bigelow Boulevard in Oakland, Pennsylvania. At that time, Detective Goob, who was driving, pulled in behind the vehicle and activated the unmarked police car's lights and air horn siren.

4.      Fallert approached the passenger side of the Sebring from behind and observed that Speaks started looking down in his lap, "scurrying around" inside the vehicle, and reaching toward and pounding on the dashboard, toward the radio area of the vehicle.

5.      As Detective Goob, who had gone to the driver's side, requested Speaks' driver's license, Fallert noticed that Speaks appeared to be unusually nervous, his hands shaking as he produced his license and rental agreement.

6.      Through the passenger window, Fallert observed a plastic baggie with one corner

---

[1] "A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *See also United States v. Foreman*, 369 F.3d 776 (4th Cir. 2004) (temperature).

missing. He recognized the item as a "diaper"–packaging material for either crack or heroin. He then reported his observation to Goob.

7. Detective Goob then removed Speaks from the vehicle and quickly handcuffed his hands behind his back for officer safety while Fallert kept an eye on Taylor.

8. Fallert then went around to the open driver's side door, knelt on the driver's seat and looked under the seat and around the interior of the car, including inside the center console. He then recovered the baggie, which was empty.

9. As he was talking with Taylor, Fallert noticed him look at the center dashboard and quickly away, upon which Fallert inspected the area more closely and "noticed that it wasn't seated completely on the trim surrounding the radio and heater . . . . It was sticking out, protruding slightly up on the upper right side." Notes of Transcript ("NT"), 4/11/2005, at 10.

10. Worried that Taylor might go for something in the vehicle, Fallert asked him to step out of the car, where Snyder was waiting and escorted Taylor to the rear of the vehicle, where Good was waiting with the detained Speaks.

11. Once Taylor had exited the car, Fallert pulled the loose panel, which came off, and could see the top of the radio and heater. He also saw a T-shirt stuffed behind on top of the radio and a gun handle, bright yellow "stamp bags" of heroin, and a plastic baggie lying on the T-shirt.

12. Fallert testified that they found the gun and heroin within four or five minutes of initiating the traffic stop and took another half hour or forty-five minutes to find the items in the trunk and have a drug sniffing dog walk around the vehicle.

13. Fallert neither had a search warrant for the vehicle nor consent from either

passenger.

14.     Fallert immediately seized the gun and they called in an ATF agent and tow truck to have the Sebring towed.

15.     Speaks and Taylor then were placed under arrest -- Taylor for false identity and conspiracy and Speaks because of the gun and drugs.  A subsequent search of Speaks revealed $697.00 in cash but no additional drugs or weapons.

16.     Once Speaks and Taylor were under arrest and before the tow truck arrived, Fallert conducted an inventory search of the vehicle, including the trunk, where he found a flour sifter, a grinder, and an ink pad and stamp inside a couple of shopping bags.

17.     On cross-examination, Fallert testified that absent discovery of the gun and drugs, Speaks would have been free to go: **Q:** "Are you able to say here whether if you had never discovered the firearm and the heroin, the defendant would have been permitted back inside his vehicle?"  **A:** "He probably would have, yes.  I don't think we would have arrested him for a Baggie with a corner cut out.  It's just a sign of possible drug transaction packaging."  **Q:** Had the gun and heroin never been found, he would have been permitted back in his vehicle?"  **A:** "Yes."

**Testimony of Detective Mark Goob**

18.     Detective Goob's testimony coincided with that of Detective Fallert in all material respects.

19.     Goob testified that as he approached the driver's side after pulling in behind the Sebring, he could see Speaks pushing or pulling on the molding surrounding the heater control and stereo system.

20.     Goob also noticed that Speaks' hands were shaking as he produced his driver's

license and rental agreement and that he "almost broke into a sweat" immediately upon Goob's approach.  "I noticed his head was dry and then all of a sudden he was, like, wet." NT, at 47.

21. Goob confirmed that he immediately placed Speaks in handcuffs for safety purposes after noticing Speaks looking around as though attempting to locate a route of escape and took him to the back of the vehicle.  Upon handcuffing him, Goob explained to Speaks that he was not under arrest, but merely being detained.

22. Having handcuffed Speaks behind his back, Goob deemed it unnecessary to do a pat down of Speaks at that time, searching him only after the arrest.  **Q:** "At some point [after you arrested him], did you do a pat down search of Mr. Speaks?"  **A:** "Fallert had stepped out of the vehicle and told me that he had observed a firearm and several stamp bags of heroin in there, and we told Speaks he was under arrest, and then I searched him incident to his arrest, actually." NT, at 49.

23. Detective Goob did not observe Fallert's actions during the search.

**Testimony of Shawn Taylor**

24. Taylor verified the validity of the traffic stop but averred that Speaks pulled over only after Taylor saw flashing red and blue lights behind them and told Speaks about it.

25. Taylor averred that at no time did Speaks reach for the front panel where the radio and heater were located.  He then said that Speaks had indeed touched that area to put CDs in.

26. Taylor testified that before escorting him to the rear of the vehicle, Sergeant Snyder patted Taylor down.  He then agreed with Detectives Fallert and Goob that Speaks was taken immediately to the rear of the vehicle, and thus he was not able to say whether Speaks was searched before or after his arrest.

27. According to Taylor, after he got out of the vehicle and before he and Speaks were arrested, Fallert conducted an extensive search of the vehicle. Taylor claimed that from the rear of the vehicle, he could see Fallert searching the entire interior of the car, including the front and back seats, behind the rear cushions, inside the glove box, and behind the door panels, which Fallert allegedly popped off. Taylor said that this pre-arrest search also encompassed the Sebring's trunk. According to Taylor, only after this thorough inspection did Fallert return to the front of the vehicle and pull the panel which revealed the weapon and drugs.

28. Taylor testified that forty-five minutes to an hour elapsed from the time Goob removed Speaks from the car until Fallert discovered the gun and heroin.

**Testimony of Carol Speaks**

29. Carol Speaks testified that she called her son, Defendant Charles Speaks, on his cell phone around 10:00 p.m. on July 31, 2004. At the time, Speaks was already under arrest and seated in the police vehicle, his phone set to speaker phone.

30. Ms. Speaks said that the call lasted for about twenty minutes, during which time Speaks asked her to call his attorney and told her that he had gotten stopped by the police and that they had searched his vehicle. She was unable to say, however, whether the handgun and drugs had been found yet, as Speaks had allegedly told her that the police were still searching the Sebring at that time.

**Testimony of Charles Speaks**

31. Speaks testified that he pulled the Sebring over on Bigelow Boulevard after seeing the police lights and hearing one of the detectives tell him to pull over.

32. Speaks denied that he was sweating or shaking during the traffic encounter.

33. He testified that he was immediately searched after being handcuffed and then taken to the rear of the car.

34. Speaks also testified that Fallert's search of the Sebring was extensive and claimed that he even observed Fallert remove what he thought was the plastic panel from the fuse box that was located on the driver's side floor.  Yet he claimed that he did not know whether he also would have been able to see Fallert's hands if they were on the radio and heater area.

35. Speaks agreed with Taylor that the police encounter took forty-five minutes to an hour from the time he exited the Sebring until Detective Fallert located the gun and heroin.

### B. Credibility Findings

1. The testimony of Detectives Fallert and Goob was entirely consistent in all relevant and material respects.  As is apparent from the above recitation of facts, however, their testimony was inconsistent with portions of Speaks' and Taylor's testimony.  The Court resolves the credibility disputes in favor of the detectives.

On the other hand, the testimony of the defense witnesses – Taylor, Speaks, and Ms. Speaks – revealed both internal and external inconsistencies.  For example: Taylor's averment that Speaks was taken immediately to the rear of the vehicle, while Speaks testified that he was first searched–a search that Taylor would have been able to observe had it taken place before Speaks was taken behind the Sebring; Taylor's claim that Speaks did not touch the radio area at all but then said that Speaks had put CDs in; and Ms. Speaks' assertions that the detectives both had finished and were still conducting the search while she spoke with her son, as well as her testimony that the search was occurring while Speaks was arrested and seated in the police vehicle, even though he and Taylor agreed that they were standing behind the Sebring and

watching Fallert as he searched the vehicle.

Additionally, Speaks' and Taylor's personal interest in the outcome of this case further convinces the Court to resolve credibility disputes in the detectives' favor.

Nevertheless, even accepting the testimony of Detectives Fallert and Goob as true and resolving all factual disputes in their favor, they had neither probable cause nor reasonable suspicion to dismantle Defendant's dashboard.

### III.     Conclusions of Law

#### A.     Reasonable Suspicion

The Fourth Amendment protects the "rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. 4. Thus, the United States Supreme Court has defined and reaffirmed the "cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment.'" *California v. Acevedo*, 500 U.S. 565, 580 (1991) (Scalia, J., concurring). That general rule admits myriad exceptions, however, including the well-established "automobile exception," whereby the police may conduct a warrantless search of an automobile provided that they have probable cause to believe that the vehicle contains evidence of criminal activity. *See Carroll v. United States*, 267 U.S. 132, 158-59 (1925). *United States v. Ross*, 456 U.S. 798 (1982), extended the scope of *Carroll* and concluded that the existence of probable cause to search a vehicle allowed the police to do a "probing search" of compartments and containers within the vehicle, *id.* at 800, to the extent that they could obtain a valid search warrant. *Id.* at 823. While the observations of a trained police officer conducting a routine traffic stop may generate probable cause to expand that detention

into a full vehicle search, probable cause must still be objectively present before the search will be constitutional. The progression of events which led to the search of Speaks' vehicle fell short of that standard.

While he disputes some of the particulars of the traffic stop, Speaks does not dispute its lawfulness. Having thus made a lawful traffic stop, Detectives Goob and Fallert justifiably removed Speaks and Taylor from the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (concluding that the "legitimate and weighty" concern for officer safety outweighs the *de minimis* personal intrusion of asking a vehicle's driver out of the car); *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (extending *Mimms* to include passengers in the interest of officer safety).

According to *United States v. Givan*, 320 F.3d 452 (3d Cir. 2003), a traffic stop justified at its inception may progress into more, i.e., an "investigative stop," *if* an officer develops a reasonable, articulable suspicion of criminal activity. *Id.* at 458. A brief investigative stop may be justified where the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Whether a suspicion is reasonable should be measured by the totality of the circumstances *in light of the officer's experience*. *Givan*, 320 F.3d at 458 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (italics added)).

Under the above standards, upon observing Speaks' nervous behavior and becoming aware of the baggie with the missing corner, which their experience informed them was packaging for narcotics, Detectives Fallert and Goob acquired reasonable suspicion that criminal activity was afoot. The scope of an investigative detention, as identified in *United States v.*

*Royer*, 460 U.S. 491, 498 (1983), authorizes only a temporary seizure sufficient for the circumscribed purpose of questioning limited to the purpose of the stop (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975). The only *reasonable* suspicion Fallert and Goob may have had here was that Speaks was transporting drugs in his vehicle. Thus, the only permissible purpose of Speaks' continued detention was to apprehend through questioning whether Speaks was indeed engaged in drug-related activity.

Both detectives testified that they were concerned for their safety. However, once Goob had removed Speaks from the car and handcuffed him behind his back, any threat from Speaks was neutralized. Moreover, Goob's own testimony evidenced that he did not consider Speaks a threat at that point. Detective Fallert further testified that he was again concerned for his safety when he noticed Taylor's glance to the dashboard and realized that the molding was not properly seated. Specifically, he was worried that Taylor might go for something (presumably a weapon) in the vehicle. Assuming that Fallert possessed a reasonable suspicion that Taylor could gain immediate control of a weapon, he could and did commence a "*Terry* patdown" of the passenger compartment of the vehicle. *Knowles v. Iowa*, 525 U.S. 113, 118 (1998) (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Moreover, assuming a reasonable suspicion that Taylor was personally armed and dangerous, Fallert could have frisked Taylor for weapons. *Terry*, 392 U.S. at 27, which Sergeant Snyder allegedly did upon Taylor's exiting the vehicle. Once it was determined that the Sebring's passenger compartment was clean and neither occupant was armed and dangerous, nothing more was needed to guarantee the officers' safety.

The only evidence of alleged criminal activity was the "diaper," which Detective Fallert testified would not have alone been sufficient to warrant arrest, and "[i]n the name of

10

investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or his automobile or other effects." *Royer*, 460 U.S. at 499.

### B.     Probable Cause

While sufficient to warrant a "pat down" of the vehicle's interior, reasonable suspicion could not justify dismantling the dashboard, as such action turned this encounter into a full-blown search requiring probable cause.

In *Knowles v. Iowa*, 525 U.S. 113 (1998), the Court addressed the propriety of a full vehicle search conducted after an officer issued a ticket for a speeding violation. *Id.* at 114. Under Iowa law, an officer having cause to believe that an individual had committed a traffic violation could either arrest her and take her before a magistrate or, alternatively, issue a ticket. *Id.* at 115.  The officer in *Knowles* chose to give the driver a ticket, but then proceeded to search the vehicle and found a bag of marijuana and a "pot pipe" under the driver's seat. *Id.* at 114.  The Iowa Supreme Court upheld the denial of the motion to suppress, concluding that because the officer had probable cause under the statute to arrest, which would have allowed him to search the vehicle, the search absent the arrest was also valid. *Id.* at 116.  The United States Supreme Court reversed. *Id.*

Observing that officer safety was a legitimate and weighty reason to have a "search incident to arrest" exception to the Fourth Amendment, the Court also noted that safety was less of a concern in the case of a traffic citation. *Id.* at 117.  "We recognize[] that 'the danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty, and not from the grounds for arrest.'" *Id.* (quoting *United States v. Robinson,* 414 U.S. 218, 234 (1973)).  "That is not to say," continued the Court, "that the concern for officer

11

safety is absent in the case of a routine traffic stop . . . [but that concern] does not by itself justify the often considerably greater intrusion attending a full field-type search." *Id*. at 117. Rather, according to *Knowles*, a *Terry*-type search necessary for officer protection may encompass only the passenger compartment, but nothing more. *Id.* at 118. For more, probable cause is necessary.

Generally, the police must secure a search warrant before commencing a search. As noted, however, various exceptions justify dispensing with that requirement, among them the "automobile exception," the "search incident to arrest" exception, and valid consent. These exceptions, which are often relevant in vehicle searches, lack application in this case.

Under the "automobile exception," the police may search a vehicle provided they have probable cause to believe that the vehicle contains contraband. *Carroll*, 267 U.S. at 156. *Carroll* granted broad authority to search where probable cause existed, as there the police located the contraband – whiskey and gin – behind the upholstery of the seats. There the officers developed probable cause from a variety of circumstances: The road they were patrolling was known as a transport avenue for illegal liquor; they knew or had reasonable evidence to believe that the occupants of the car were "bootleggers"; they were familiar with the defendants' vehicle; and they had observed the defendants traveling the same route on previous occasions. *Id.* at 160.

As delineated above, Detective Fallert's suspicions resulted from far less and did not amount to probable cause to search. Both detectives had already observed Speaks' excessive nervousness (and had neutralized any potential threat he may have posed) and the "diaper." Nonetheless, as Detective Fallert testified, those factors alone were insufficient to justify arrest and Speaks would have been free to return to the vehicle. It is unreasonable to conclude that the additional factor of the partially unseated trim surround the radio and heater controls elevated

mere suspicion to probable cause.

Nor may the detectives rely on the "search incident to arrest" or consent exceptions. By their own testimony, although Speaks was in handcuffs before Fallert discovered the gun and heroin, neither he nor Taylor was arrested until Fallert found the contraband.[2] Moreover, Fallert also testified that he had not obtained either passengers' consent to search.

Many years after articulating the standards in *Carroll* for the "automobile exception," the Supreme Court decided *United States v. Ross*, 456 U.S. 798 (1982), which reaffirmed and arguably strengthened the *Carroll* holding. The *Ross* Court, addressing the issue of whether the police could search a stopped vehicle, articulated that officers possessing *probable cause* that contraband was being hidden in the vehicle may conduct a "probing" search of the vehicle, i.e., they may conduct a search as thorough as a properly issued warrant would allow. *Id.* at 800. Probable cause remained the standard, however; nothing less would suffice. As the Court elucidated, the probable cause determination must be based on *objective* facts sufficient to justify the warrant; an officer's good faith alone would not necessarily be enough. *Id.* at 808. In *Ross*, the police received specific information from a reliable informant concerning the defendant and the sale of narcotics out of his vehicle. *Id.* at 800. The informant told the officers that the defendant had drugs in his trunk, and after confirming that the description and identity of the defendant, his vehicle, and other circumstances coincided with the informant's report, the police stopped the defendant and conducted a search of his trunk. *Id.* at 800-01. Because the officers

---

[2] This Court rejects as after-the-fact rationalizing the possibility that Defendant was under arrest at the time of the search. *See e.g., Government's Proposed Findings of Fact and Conclusions of Law* at 6. Such rationalizing directly contradicts the detectives' testimony as stated above – that Speaks was merely detained for officer safety.

could have obtained a warrant on that information, said the Court, the warrantless search was proper.

The facts available to the police in *Ross* created a situation roughly analogous to *Carroll* for purposes of a probable cause determination. This case presents no such analog, however, and thus does not and cannot justify a like result. One cannot reasonably question that dismantling the dashboard to look for a weapon constitutes a "probing" search of the vehicle. "*If* probable cause justifies the search of a lawfully stopped vehicle," said *Ross*, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825 (emphasis added). That "if" is conclusive of the negative implication that lack of probable cause forecloses such a search.

An arrest, too, as a seizure of the person, requires probable cause. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Here the arrest only occurred as a result of the unconstitutional search of Defendant's vehicle. The subsequent inventory search then flowed from the unlawful arrest. Thus, both incidents emerge as "fruits of the poisonous tree," and these, too, are therefore invalid.

The Supreme Court has long held that evidence resulting from an unlawful search could not constitute evidence against the victim of the search. *Weeks v. United States*, 116 U.S. 616 (1914). Such evidence constitutes "fruits of the poisonous tree" and must be excluded. *Wong Sun v. United States*, 371 U.S. 471 (1963). This principle of exclusion applies to both direct and indirect evidence. *Silverthorn Lumber Co. v. United States*, 251 U.S. 385 (1920). That doctrine readily applies here. Had Fallert not conducted the unlawful search of the vehicle, Goob would have lacked probable cause to make an arrest, and had the unlawful arrest not occurred, the

detainees would have been free to leave and the inventory search never undertaken.

Absent an exception to the warrant requirement which would have justified the warrantless search here at issue, and without probable cause, the search revealing the heroin and handgun was in violation of the Fourth Amendment.  The Constitution thus requires that these items, as well as all evidence obtained as a result of the initial unconstitutional search, be suppressed.  Thus, Defendant's Motion to Suppress is hereby granted.

An appropriate order will be entered.


        **/s/    Arthur J. Schwab**
**Arthur J. Schwab**
**United States District Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

     v.                                         Criminal No. 04-193
                                                   Electronically filed

CHARLES SPEAKS, JR.

## ORDER OF COURT

AND NOW, this 30th day of June, 2005, for the reasons set forth in the accompanying memorandum opinion, **IT IS HEREBY ORDERED** that defendant's motion to suppress (Document No. 18) is **GRANTED**.

**IT IS FURTHER ORDERED** that in the trial of this case, the government is precluded from offering evidence obtained directly in or derivatively from the unlawful search of defendant's rental vehicle on July 31, 2004, as set forth more specifically in the memorandum opinion.

                                                             /s/    **Arthur J. Schwab**
                                                          **Arthur J. Schwab**
                                                          **United States District Judge**

cc:    All counsel of record as listed below

Michael Comber, Esquire
United States Attorney's Office
700 Grant Street, Suite 400
Pittsburgh, PA 15219

James A. Wymard, Esquire
220 Grant Street
Pittsburgh, PA 15219